a

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA DIVISION

| | |
|---|---|
| MICHAEL L GREENE #22768-058, Plaintiff | CIVIL DOCKET NO. 1:25-CV-00538 SEC P |
| VERSUS | JUDGE TERRY A. DOUGHTY |
| MIRANDA BORDELON ET AL, Defendants | MAGISTRATE JUDGE PEREZ-MONTES |

REPORT AND RECOMMENDATION

Before the Court is a civil Complaint (ECF No. 1) filed pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), by pro se Plaintiff Michael L. Greene ("Greene"). Greene is imprisoned at the United States Penitentiary in Pollock, Louisiana ("USP-P"). He requests monetary damages and injunctive relief for the alleged deprivation of adequate medical care and retaliation.

Because Greene fails to state a viable claim, his Complaint should be DENIED and DISMISSED WITH PREJUDICE.

I.  Background

Greene claims he has been on a hunger strike since February 15, 2025, to protest: (1) the Bureau of Prison's ("BOP") failure to properly classify him as a medium security inmate; (2) widespread corruption in the BOP's maximum security prisons; and (3) USP-P's contaminated water system.  ECF No. 1 at 1-3.  He asserts

that he "will not eat again until the BOP addresses the aforementioned issues." *Id.* at 3.

Greene alleges that his hunger strike is causing low blood sugar, low blood pressure, left kidney pain, extreme migraine headaches, dizzy spells, and "blacking out." ECF No. 1 at 3.

Greene further alleges that, in retaliation for his protest, Miranda Bordelon is colluding with other staff members to punish him by taking him off Ensure health supplement drink and intentionally trying to make Greene "pass out" so they can "force a tube up his nose." *Id.* at 4. Greene asserts that he was wrongfully moved from a medical observation cell to a non-observation cell in the Special Housing Unit ("SHU"), in violation of BOP policy. *Id.* at 5. He also alleges that Defendants falsified documents claiming that Greene had eaten food. *Id.* at 5-6.

Greene seeks injunctive relief in the form of an order that Defendants provide him with Ensure or other fluids while he is on strike, an order that he be transferred to another facility, and for costs to be assessed to Defendants. ECF No. 1 at 6.

In his Motion for Emergency Hearing, Greene alleges that he was transported to the emergency room on May 5, 2025, to receive intravenous fluids due to dehydration. ECF No. 6 at 2. He states that on May 9, 2025, Defendants threatened to "force feed" him. *Id.*

In an Amended Complaint, Greene alleges that the prison doctor ordered that he be provided with Ensure, broth, and other fluids, but staff members refuse to comply with the doctor's order. ECF No. 10 at 2. Considering this new allegation,

the Court ordered the Government to respond to the Emergency Motion and Complaint within seven days.

Greene seeks damages "in excess of six million dollars," as well as injunctive relief. ECF No. 18.

II. Law and Analysis

A. Greene's Complaint is subject to preliminary screening.

Because Greene is a prisoner[1] suing officers or employees of a governmental entity and proceeding *in forma pauperis*, his Complaint is subject to preliminary screening under 28 U.S.C. § 1915A and § 1915(e)(2). Both statues provide for *sua sponte* dismissal of a complaint, or any portion thereof, if a court finds it is frivolous or malicious, if it fails to state a claim upon which relief may be granted, or if it seeks monetary relief against a defendant who is immune from such relief. *Id.*

B. Greene fails to state a viable claim for damages or injunctive relief.

A *Bivens* claim is "an implied private action for damages against federal officers alleged to have violated a citizen's constitutional rights." *Correctional Servs. Corp. v. Malesko*, 534 U.S. 61, 66 (2001). In *Bivens*, the Supreme Court recognized a cause of action for money damages under the Fourth Amendment where federal agents allegedly "manacled" the plaintiff "in front of his wife and children and threatened to arrest the entire family"; "searched the apartment from stem to stem";

---

[1] Under 28 U.S.C. § 1915(h), "'prisoner' means any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program."

and took him to a federal courthouse where he was "interrogated, booked, and subjected to a visual strip search." *Bivens*, 403 U.S. at 389.

In the next decade, the Supreme Court recognized two other causes of action against federal officers: (1) for sex discrimination against a former congressional staffer in violation of the Fifth Amendment, *see Davis v. Passman*, 442 U.S. 228 (1979); and (2) for a failure to provide an asthmatic prisoner with adequate medical care in violation of the Eighth Amendment, *see Carlson v. Green*, 446 U.S. 14 (1980). Since then, the Supreme Court has not once extended the *Bivens* remedy, and it has declined to do so at least a dozen times. *See Looper v. Jones*, 22-40579, 2023 WL 5814910, at *1 (5th Cir. 2023) (per curiam) (unpublished) (citing *Egbert v. Boule*, 596 U.S. 482 (2022)).

Greene alleges that he is being denied adequate medical care in violation of the Eighth Amendment and subject to retaliation under the First Amendment. To succeed on a claim for the deprivation of medical care, a plaintiff must show that Defendants are deliberately indifferent to his serious medical needs. To state a viable claim, a plaintiff must allege that a federal actor refused to treat him, ignored his complaints, knowingly treated him incorrectly, or otherwise evidenced a wanton disregard for his serious medical needs. *See Carlucci v. Chapa*, 884 F.3d 534, 538 (5th Cir. 2018) (citing *Domino v. Texas Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001)). Greene provides no such allegations. In fact, he admits that he was provided medical care when he was recently transported to the emergency room to receive treatment for dehydration. ECF No. 6 at 1.

Furthermore, the Government provided records documenting the extensive medical care Greene received. ECF No. 13-1. Greene formally declared his hunger strike on February 15, 2025. ECF No. 13-1 at 1151. On February 18, 2025, V. Jameson, RN, BSN, assessed Greene and documented his hunger strike. ECF No. 13-1 at 815. Nurse Jameson recorded Greene's weight at 140.4 pounds and notified the psychology services department of Greene's condition. *Id.* at 815-16. Nurse Jameson advised Greene of the potential adverse health results of failing to intake adequate nutrition, and Greene verbalized his understanding. *Id.* Greene was placed on medical observation, where he received several daily medical encounters. *Id.* Prison officials continued to deliver Greene's meals, which he refused. ECF No. 13-1 at 4.

On February 19, 2025, normal vital statistics were noted, and Greene's weight was recorded at 139.5. ECF No. 13-1 at 812-13. Greene refused water. *Id.* at 813. Greene complained that he should not be housed at a penitentiary. *Id.* at 812.

The following day, Greene's weight was recorded at 137. *Id.* at 809. Maxwell Dunbar, RN, noted elevated heart rate during seated to standing position change, as well as dark urine output. *Id.* at 810. Greene was advised of the risks of deficient calorie intake and advised to hydrate to protect organ function. *Id.*

Greene was also evaluated by Dr. Padilla that day. *Id.* at 803. Greene denied swallowing anything, but had a history of swallowing objects to obtain transport to an outside hospital. *Id.* Dr. Padilla ordered bloodwork, vitamins, and a urinalysis for the duration of the hunger strike. *Id.* Greene was advised of the possibility of

involuntary feeding if his medical condition became emergent, and he was advised to drink water to avoid kidney damage. *Id.* Greene again expressed his disagreement with his placement at a penitentiary as the impetus for his hunger strike. *Id.*

Prison staff continued to monitor Greene multiple times per day, but Greene frequently refused lab work. ECF No. 13-1 at 769, 783, 792, 1094-99. Greene advised Dr. Padilla that he would comply in exchange for "some old newspapers and magazines." *Id.* at 792. Dr. Padilla noted that Greene received reading material the day before, and "no newspapers or magazines will be exchanged for compliance." *Id.*

Greene continued to report that his hunger strike was due to his belief that he should not be housed in a penitentiary. *Id.* at 233, 621, 787, 798, 808, 812, 983. At times, Greene refused medical care, stating that he will not eat or consent to medical assessment until he is transferred from UPS-P. *Id.* Greene was again advised to drink water, eat small, frequent meals, and rest as needed. *Id.* at 780.

On February 24, 2025, Greene refused medical assessment and lab work. He took prescribed medication without water. *Id.* at 769-771. Greene expressed a desire to drink juice or coffee. *Id.* He was offered Ensure, but he refused. *Id.* Greene refused assessment and labs again on February 25 and 26, 2025. *Id.* at 751, 758.

On the afternoon of February 26, 2025, Dr. Padilla noted that Greene's urine contained ketones and protein, which could require a use of force to conduct blood work and potential forced feeding. *Id.* at 750. L. Kirkham, NP, ordered the administration of three bottles of Ensure daily. *Id.* at 748. Greene was provided

three bottles that day with Nurse Jameson and Ms. Bordelon as witnesses. *Id.* at 746.

The following morning, Greene reported having consumed the three bottles of Ensure and two cups of water. ECF No. 13-1 at 744. Dr. Padilla advised Greene that staff would do whatever was necessary to preserve his life and health, including forced feeding, if necessary. *Id.* Greene then permitted staff to draw labs. He also drank a bottle of Ensure and two cups of water. *Id.* Greene indicated that he "might eat something later on." *Id.*

On February 28, 2025, Greene reported feeling better than the day before. He continued to drink Ensure and water and comply with medical assessments through March 12, 2025. *Id.* at 652- 734.

On March 12, Nurse Practitioner Kirkham noted that Greene and had been on the nutritional supplement for 10 days, and his weight had stabilized at 133 lbs. *Id.* at 678. Nurse Practitioner Kirkham discussed discontinuing the nutritional supplement, to which Greene reportedly responded: "Yeah, I probably don't need it anyway. Just bring me some coffee and milk." *Id.*at 678. The nurse practitioner encouraged Greene to transition to solid foods. *Id.*

Greene continued to refuse meals, but indicated that he was drinking water. ECF No. 622-651. On March 18, 2025, Greene informed staff that he had no intention of transitioning to solid food until he is transferred to a medium level institution. *Id.* at 621. He also stated: "I don't really want Ensure but I go ahead and ask for it so ya'll can document that I'm asking for it so I don't have to get force fed." *Id.* at 621.

Nurse Practitioner Kirkham noted that Greene was consuming fluids throughout the day such as water, Kool-Aid, and milk with creamer and sugar. He was also taking daily vitamin supplements. *Id.*

Staff continued to monitor Greene's heath several times per day. *Id.* at 589-621. On March 25, 2025, Greene reported dizziness upon standing, but denied dizziness during the assessment. *Id.* at 588. Later that day, Nurse Sasser ordered the administration of IV fluids. *Id.* at 580.

Greene was transferred from the medical observation unit to the SHU on March 26, 2025. ECF No. 13-1 at 576, 1156. Regular and consistent medical checks continued.

On March 28, 2025, Nurse Sasser noted that Greene received two dinner trays the prior evening. "He consumed the bottom portion of the cornbread, more than half of the collard greens, the chicken quarter, and half of the sweet potato from both trays. However, he still claims that he didn't eat." *Id.* at 564. Greene disputes this allegation.

On April 2, 2025, Dr. Serrano-Mercado noted:

> During all this time, patient has been hydrating enough to produce urine and bowel movements. Only on 1 occasion he needed to be encouraged to increase hydration due to signs of orthostatic hypotension which since then has not occurred again.
>
> He's had a total weight loss of 12.4 pounds. Starting weight:140#, current weight: 128# with a BMI of 17.4.
>
> He was observed gaining 2 pounds on 04/01/25.
>
> His lab work is reported with normal kidney function and normal pre-albumin levels on labs available until today.

> My recommendation at this time is to monitor very closely to ensure he is not eating from the trays and follow with good documentation of this. He seems to be due for labs tomorrow, these would be good to have them done to monitor again his kidney function and rest of lytes.
>
> As of today, he does not show signs of dehydration or orthostatic hypotension with review of labs and vital signs reviewed.

ECF No. 13-1 at 534. Daily medical assessments continued, with Greene reporting to consume water, milk, and coffee. *Id.* at 471-525.

On April 15, 2025, Greene refused his medical assessment. *Id.* at 467. He complained: "y'all refusing to give me liquids." *Id.* at 468. Greene admitted that the sink in his cell was working, but stated that he wants other things to drink. *Id.*

Greene continued to refuse medical assessments until April 21, 2025. He claimed that he had not urinated or ingested fluids for seven days, except for coffee the day before. ECF No. 13-1 at 436. He took his medication without water. *Id.* After Nurse Guillory left, Greene requested milk from his breakfast tray, which an officer provided. *Id.*

On April 24, 2025, Greene refused to leave his cell in the SHU for medical assessment. *Id.* at 430. He was transferred back to the medical observation cell. *Id.* The following day, Greene consented to a full medical assessment and labs. *Id.* at 424-26. His weight was 125 lbs. *Id.* at 422. Greene denied intake of fluids, but again requested milk from the breakfast trays and a cup of water. *Id.* Greene reported that he last urinated two days prior. *Id.*

Over the following days, Greene increased fluid intake and was returned to general population. ECF No. 13-1 at 407-12. Still, he continued to refuse meals. *Id.*

On April 30, 2025, Greene was transported back to medical observation and consented to assessment. *Id.* at 398. Nurse Practitioner Delrie informed Greene that his thiamine level was low, and Greene agreed to take vitamins. *Id.* at 394. The nurse practitioner ordered multivitamins, Vitamin B, and Thiamine tablets. *Id.* at 396.

Daily monitoring continued through May 2, 2025, where Nurse Practitioner Delrie noted hypotension. *Id.* at 376, 379. The nurse practitioner had a "long discussion" with Greene about his increased chance of organ failure and death from malnutrition. *Id.* Greene was agreeable to labs and IV hydration. *Id.*

A few hours later, Dr. Padilla examined Greene and noted orthostatic hypotension, low Vitamin B, and creatine. *Id.* at 376. Dr. Padilla administered IV fluids and prescribed two cartons of nutritional supplement three times per day for four days. *Id.* at 378.

Greene consumed Ensure on May 3 through 5, 2025, but continued to refuse food. His weight was between 127-129 lbs. *Id.* at 362, 372, 383. Dr. Serrano-Mercado performed a chart review, finding that Greene was at high risk for refeeding syndrome. *Id.* at 356. The doctor recommended evaluation for psychosis due to Greene's low thiamine level. *Id.* Dr. Serrano-Mercado also recommended:

1. Urine and prealbumin at least weekly and I would add thiamine since he is already less than 6. He was evaluated by psychology on 04/25/25 and found him not psychotic. Every time he continues to have thiamine low, I would suggest psychology referral to rule out psychosis.
2. Rest of the chemistries with Mg, Phosphorus, and thiamine every 2 weeks or by clinical judgement.

3. He should be offered every single day: thiamine 100 mg daily, B complex 1 tab daily and Multivitamin tab I daily.
4. Ensure or oral nutritional supplement CAN be offered for voluntary consumption ONLY IF there is objective evidence of malnutrition and would otherwise require enteral feeding. These are provided to avoid refeeding syndrome for when he starts oral consumption.
    *** If he continues to lose weight and reaches 10% of total weight loss in 3 months, I will recommend proceeding with ENTERAL FEEDING with Nutren or Resource 2.0. and to follow as stated on Appendix 4, page 21 of the Hunger Strike CPG's. *** I would also suggest continuing with psychology evaluations weekly since this is a requisite prior to enteral feeding and he is very close to this. ***
5. His prealbumin has continuously been reported among normal values. If prealbumin drops to 15, an immediate psychology evaluation should be performed to go towards involuntary feeding since we need to make sure he does not drop to a prealbumin 11 because that would place him at a higher mortality level.
6. With the reported labs today: I would suggest starting an IV fluid: Half normal saline (0.45%) I Liter with 500 mg Thiamine at 250 mL/hr. *** Ensure the IVF DOES NOT have added glucose. If you only have 0.45% with DSW, you WILL NEED to administer first by itself the thiamine 500 mg prior to the IVF. ***
7. Continue close monitoring of his weight and vitals.

*Id.* at 356. Ensure was discontinued, and Greene was transported to the emergency room for administration of intravenous fluids with thiamine. *Id.* at 352, 1131.

Hospital records note:

> 47-year-old male with depression is here from Pollock prison on a Hunger Strike for the past 75 days drinking only fluids and lab work was collected and thiamine is <6 from lab collected 4-25-25. Patient has been taking oral thiamine 100 mg since April 30th and repeat lab work collected May 2nd has not resulted yet. Regional Medical Director recommends thiamine 500 mg IV at local ED so has come from local prison and he does state he has been drinking ensure 2 cans 3 times a day since Friday.

ECF No. 13-1 at 1117.  Greene was administered intravenous fluids with thiamine. *Id.* at 1117, 1131.  His lab work returned to normal, and he was transported back to USP-P.  *Id.*

Greene continued fluid intake, and medical staff monitored his health with labs and physical assessments.  However, on May 9, 2025, Greene refused fluids and vitamins.  He stated that he would not drink until some of his "conditions" were met.  *Id.* at 312.  His weight was recorded at 123 lbs., so Nurse Practitioner Delrie discussed possible enteral feedings.  *Id.*  Greene drank water and coffee, and Dr. Padilla prescribed four days of the nutritional supplement regimen.  *Id.*  Greene advised Dr. Padilla that he "is going to sue everyone."  *Id.* at 311.  Greene reiterated that he should not be housed at a penitentiary.  *Id.*

Greene's protocol remained the same, and his condition was stable through May 20, 2025.  ECF No. 13-1 at 247-299.  However, on May 21, 2025, Dr. Serrano-Mercado noted that Greene was orthostatic and losing weight despite consuming six boxes of Ensure daily.  *Id.* at 240.  Accordingly, Dr. Serrano-Mercado ordered enteral feeding.  *Id.*

Nurse Practitioner Delrie had "multiple discussions" with Greene about nasogastric feeding, but he still refused food.  *Id.* at 232.  The warden authorized the feeding, and a nasal gastric tube ("NGT") was placed, delivering 250 mL of enteral feeding.  *Id.*  Greene returned to medical observation.  The nurse practitioner explained that NGT feedings would continue for nine days if Greene continued his strike.  Greene replied: "You know I'm not going to eat."  *Id.*

Each day, Greene was provided the opportunity to eat, and each day he declined. The NGT feedings continued. *Id.* Greene spoke "loudly and frequently about his pending court cases" throughout the feedings, and claimed he was being tortured. *Id.* at 186, 205, 214. On May 27, 2025, the NGT feedings were discontinued due to Greene's improvement. *Id.* at 152-53.

Dr. Padilla examined Greene on June 4, 2025, and discussed the reasons for Greene's hunger strike. *Id.* at 113. Dr. Padilla advised Greene that no one was lying to him, and everyone has tried to help him. He informed Greene that "the BOP has strict policies on points and time served and him doing a hunger strike was not going to change that policy." *Id.* When Greene complained that his Ensure was discontinued, Dr. Padilla explained "that BOP policy does not support chronic use of Ensure" and that enteral feeding "is done if his BMI gets to 17 or below." *Id.* Dr. Padilla recommended four packets of milk powder with each meal. *Id.*

Hunger strike protocol continued, with Greene receiving 4 to 5 packets of milk with every meal. *Id.* at 17, 20, 25, 56, 61, 76. On June 8 and 11, 2025, Greene declared that he was feeling "great." *Id.* at 34, 65-66.

The record is clear that Defendants have not refused to treat Greene, ignored his complaints, knowingly treated him incorrectly, or otherwise evidenced a wanton disregard for his serious medical needs. In fact, the medical documents prove the opposite. Greene has received—and continues to receive—medical assessments multiple times a day, as well as medical treatment from numerous medical doctors, nurse practitioners, and registered nurses.

Greene believes that he should be provided specific medical care in the form of Ensure nutritional supplement. But Greene experienced orthostatic hypotension and weight loss even with six boxes of Ensure per day. ECF No. 13-1 at 240. And Dr. Padilla explained that Ensure is not a long-term solution or treatment. *Id.* at 113. The record shows that prison officials have followed all the medical orders issued by Dr. Padilla and Dr. Serrano-Mercado. Greene clearly disagrees with the medical care he is receiving, but a prisoner's disagreement with medical treatment is generally not sufficient to show deliberate indifference. *See Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006); *see also Sanders v. United States*, 438 F.2d 918, 919 (5th Cir. 1971) ("Since petitioner does not wish to undergo extensive dental extractions, the prison authorities are not to be held responsible for the cause of his suffering."). Greene's choice to engage in a prolonged hunger strike due to his belief that he is misclassified is the cause of his suffering.

Greene's allegation that USP-P water is contaminated is unsupported and conclusory. ECF No. 1 at 3. Conclusory allegations are insufficient to state a constitutional claim. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

Greene asserts that Defendants are unconstitutionally threatening to "force-feed" him. Federal courts have generally approved of force-feeding inmates on hunger strike, regardless of whether the person was a convicted prisoner, a pre-trial detainee, or a person held pursuant to a civil contempt order. *See In re Soliman*, 134 F.Supp.2d 1238, 1255 (N.D. Ala. 2001); *see also United States v. Richards*, 23-CV-10025, 2023 WL 6216338, at *1 (D. Kan. 2023) (authorizing force-feeding); *Aamer v. Obama*, 953

F. Supp. 2d 213, 222 (D.D.C. 2013) (denying injunction to stop Government from force-feeding). Furthermore, federal regulations specifically authorize force-feeding or other medical treatment for prisoners on hunger strikes without the prisoner's consent if there is "a medical necessity for immediate treatment of a life or health threatening situation." 28 C.F.R. § 549.65. "The mere allegation of forced-feeding does not describe a constitutional violation," *Martinez v. Turner*, 977 F.2d 421 (8th Cir. 1992), nor does the threat of force-feeding, *Watson v. Winborn*, No. 02-10984, 2003 WL 21108479, at *1 (5th Cir. 2003) (per curiam) (verbal threats do not amount to a constitutional violation); *see also Garza v. Carlson*, 877 F.2d 14, 17 (8th Cir. 1989) (prisoner's constitutional rights "were not violated by the threat of receiving involuntary nourishment").

Accordingly, Greene fails to adequately allege a constitutional deprivation of medical care sufficient to state a viable *Bivens* claim or a claim for injunctive relief.

Greene alleges that Miranda Bordelon retaliated by refusing to provide him with Ensure nutritional supplement. However, the Supreme Court has never recognized a *Bivens* cause of action under the First Amendment. *Watkins v. Three Admin. Remedy Coordinators of Bureau of Prisons*, 998 F.3d 682, 686 (5th Cir. 2021) (citing *Reichle v. Howards*, 566 U.S. 658, 663 n.4 (2012); *Bush v. Lucas*, 462 U.S. 367, 368 (1983)). And Greene does not state a viable claim for injunctive relief based on his allegations of retaliation. "To state a claim of retaliation an inmate must allege the violation of a specific constitutional right and be prepared to establish that but for the retaliatory motive the complained of incident . . . would not have occurred."

*Woods v. Smith*, 60 F.3d 1161, 1166 (5th Cir. 1995). Greene does not adequately allege the violation of a constitutional right because "where a prison grievance process exists, undertaking a hunger strike 'does not clearly implicate the exercise of any specific constitutional right and does not support a claim for retaliation.'" *Garrett v. Lumpkin*, 23-cv-2792, 2023 WL 6798120, at *3 (S.D. Tex. 2023), *appeal dismissed*, 23-20529, 2024 WL 4708000 (5th Cir. 2024) (quoting *Hogan v. Prince*, 14-cv-138, 2015 WL 4527683, at *5 (M.D. La. 2015); *see also Freeman v. Texas Dep't of Criminal Justice*, 369 F.3d 854, 864 (5th Cir. 2004) ("'If the inmate is unable to point to a specific constitutional right that has been violated, the [retaliation] claim will fail.'") (citation omitted). Furthermore, as discussed above, Ensure was only prescribed by physicians at certain times—and Greene received the Ensure as prescribed.

*Bivens* has likewise never been extended to a claim regarding custody classification or housing assignments. Therefore, Greene fails to state a viable claim for damages related to his classification. Nor does he state a viable claim for injunctive relief. A prisoner has no protected liberty interest in the location of his confinement or his custody classification. *See Neals v. Norwood*, 59 F.3d 530, 533 (5th Cir. 1995) (explaining that "a prison and an inmate's disagreement with a classification is insufficient to establish a constitutional violation"); *see also Canfield v. Dir., TDCJ*, 6:24-cv-060, 2025 WL 1062313, at *4 (E.D. Tex. 2025), *report and recommendation adopted,* 2025 WL 830992 (E.D. Tex. 2025); *Taylor v. Carlize*, 172 F. App'x 589, 591 (5th Cir. 2006) (citing *Meachum v. Fano,* 427 U.S. 215, 225 (1976)); *Armendariz-Mata v. Lappin*, 157 F. App'x 767, 768 (5th Cir. 2005); *Yates v. Stalder*,

217 F.3d 332, 334 (5th Cir. 2000); *Doughty v. Vannoy*, 20-cv-117, 2020 WL 6054930, at *5 (M.D. La. 2020), *report and recommendation adopted*, 2020 WL 6051252 (M.D. La. 2020). Prison psychologist Dr. Stephenson contacted Greene's unit team for clarification regarding Greene's classification. Dr. Stephenson noted that the BOP would not consider placement in a medium security facility because Green had over 30 years remaining on his sentence. *See* ECF No. 13-1 at 980 ("Greene was informed due to sentence length (still having more than 30 years on his sentence) an FCI will not be considered."); ECF No. 13-1 at 986 (Greene "cannot go to an FCI until he has under 20 years left on his sentence"). Greene has no right to be housed at another facility.

### III. Conclusion

Because Greene fails to state a viable constitutional claim for injunctive relief or damages under *Bivens*, IT IS RECOMMENDED that the Complaint (ECF No. 1) be DENIED and DISMISSED WITH PREJUDICE under 28 U.S.C. §§ 1915(e)(2)(b) and 1915A.

Under 28 U.S.C. § 636(b)(1)(c) and Fed. R. Civ. P. 72(b), a party may file written objections to this Report and Recommendation within 14 days of service, unless the Court grants an extension of time to file objections under Fed. R. Civ. P. 6(b). A party may also respond to another party's objections to this Report and Recommendation within 14 days of service of those objections, again unless the Court grants an extension of time to file a response to objections.

No other briefs may be filed without leave of court, which will only be granted for good cause. A party's failure to timely file written objections to this Report and Recommendation will bar a party from later challenging factual or legal conclusions adopted by the District Judge, except if the challenge asserts "plain error."

SIGNED on Thursday, October 23, 2025.

JOSEPH H.L. PEREZ-MONTES
UNITED STATES MAGISTRATE JUDGE